*Formatted for Electronic Distribution*                                              *Not for Publication*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

In re:

    **Douglas A. Yantz, Jr.,**                                                     Chapter 13 Case
          **Debtor.**                                                             # 04-10370

| | | |
|---|---|---|
| *Appearances:* | *Kathleen Walls, Esq.* | *Jane Osborne McKnight, Esq.* |
| | *Middlebury, VT* | *Shelburne, VT* |
| | *Attorney for Debtor* | *Creditor* Pro Se |

### MEMORANDUM OF DECISION
### SUSTAINING DEBTOR'S OBJECTION TO CLAIM

      For the reasons set forth below, and based upon all papers filed in this matter and the evidentiary hearing held on July 8, 2004, the Debtor's objection to the secured claim of creditor Jane Osborne McKnight ("Attorney McKnight") is sustained and the claim of Attorney McKnight totaling $6,544.08 is allowed in full, as an unsecured claim.

### BACKGROUND

      The Court considers unique circumstances in this case. Attorney McKnight represented the Debtor in connection with a mortgage foreclosure action prior to his filing a chapter 13 case. Attorney McKnight filed a proof of claim in the chapter 13 case, asserting secured status for a portion of the claim. She also filed an Objection to the Confirmation of the Plan objecting to the amount of money to be distributed to unsecured creditors. She challenged the figures presented in Schedule J of the Plan that alleged that the Debtor only had an estimated annual income of $82,000 (doc. # 11 ¶ 4). She asserted that the Debtor, during oral representations to her, had stated that he made gross income in excess of $100,000 per year (doc. # 11 ¶ 3). The Debtor filed an Objection to Claim challenging Attorney McKnight's claim on three bases: (1) Attorney McKnight had not been retained to represent the Debtor, referring to the Debtor's testimony to this effect at the § 341(a) meeting of creditors; (2) the documents attached to the proof of claim were insufficient to support the charges asserted to be due to Attorney McKnight for services rendered; and (3) Attorney McKnight had not provided documents evidencing a security interest in the 1999 Polaris snowmobile (doc. # 14 ¶ 1). The Debtor and Attorney McKnight each filed a memorandum of law setting forth their respective arguments as to whether an enforceable security interest existed between the parties (see docs. # 25, 28, 31, 32).

The Court overruled Attorney McKnight's objection to confirmation and confirmed the plan subject to a later determination of the status of Attorney McKnight's claim (see Order of Confirmation entered on July 19, 2004, doc. # 50), and set an evidentiary hearing to ascertain whether the parties had entered into a secured transaction, whether a security interest had been created, and, ultimately, whether the claim could be allowed as a secured claim (see Order dated June 22, 2004, doc. # 34).

## ISSUES PRESENTED

At the time of the evidentiary hearing, it was undisputed that Attorney McKnight had never presented to the Debtor for signature, and the Debtor had never executed and delivered to her, any document purporting to be a security agreement. The specific issue presented was whether the Debtor could be deemed to have granted Attorney McKnight a security interest in any of the Debtor's assets, to secure payment of the subject attorney's fees, notwithstanding the absence of an actual security agreement. Although the arguments evolved during the course of this contested matter, the issues ultimately presented for determination were as follows:

(1) whether a summary message regarding a telephone conversation constitutes a "writing" for purposes of the UCC;

(2) whether oral promises of a debtor that a debt will be paid upon the sale of certain property constitutes the granting of a security interest in that property;

(3) whether a creditor can rely upon two separate writings, that are not contemporaneous and do not refer to one another, to demonstrate the existence of a security agreement, and, if so, whether the evidence demonstrates that there was a meeting of the minds that the parties intended these two documents to be construed together to create such a security agreement; and

(4) whether the fact that the creditor was fraudulently induced to enter into a debtor - creditor relationship with the debtor entitles her to the rights of a secured creditor even if she cannot establish the necessary elements for a security interest under the UCC.

## DISCUSSION

As the party alleging the security interest, Attorney McKnight had the burden to establish that an enforceable security agreement existed between the Debtor and herself. Attorney McKnight filed a proof of claim asserting that she holds a claim in the amount of $6,544.08 and that $2,500.00 of that claim is secured by a 1999 Polaris snowmobile. There is no question that the filing of the proof of claim constitutes *prima facie* evidence of the validity of the claim. 11 U.S.C. § 502(a). The Debtor objected to the secured status of Attorney McKnight's claim, pointing to the lack of a security agreement. If the objecting party provides

sufficient evidence questioning the validity of the claim, then the burden returns to the claimant to provide sufficient evidence to maintain and prove the claim. HON. BARRY RUSSELL, BANKRUPTCY EVIDENCE MANUAL, § 301.52, (2002 ed.). Consequently, Attorney McKnight had the burden of proof to establish the factors necessary to evidence an enforceable security interest, namely: (1) value has been given; (2) the debtor had rights in the collateral or power to transfer rights in the collateral to a secured party; and (3) the debtor has authenticated a security agreement that provides a description of the collateral. 9A V.S.A. § 9-203(b). Attorney McKnight also must establish whether there was a requisite meeting of the minds between the Debtor and herself at the time in order to use multiple documents together to establish the existence of a security agreement. In re Cantu, 238 B.R. 796, 800 (B.A.P. 8th Cir. 1999).

Attorney McKnight originally argued that snowmobiles were not governed by Article 9 of the UCC (doc. # 31 ¶ 3). In the alternative, she proposed that a security agreement under Vermont law did not require particular formality (doc. # 31 ¶ 7). Attorney McKnight further supported this proposition in her supplemental memorandum of law submitted following the evidentiary hearing (doc. # 46 ¶ 41). Moreover, Attorney McKnight proposed a broad definition for agreement as "a coming together of the minds." BLACK'S LAW DICTIONARY 62 (5th ed. 1979), and asserted that she could prove that this broad definition of agreement had been met between herself and the Debtor and thus that a security interest had been created (doc. # 31 ¶ 6). The parties each presented evidence at the July 8th hearing as to whether Attorney McKnight and the Debtor had a security agreement even though there is no document that is labeled as such and signed by the Debtor.

**Elements Required for the Creation of an Enforceable Security Interest**

Authenticated Security Agreement

Under 9A V.S.A. § 9-203(b)(3)(A)[1], in order to establish a security interest, there must be an authenticated security agreement that provides a description of the collateral. In the former Article 9, security agreement was colloquially used to refer to the document or writing that contained a debtor's security agreement. In the Official Comment to current Article 9 (effective in Vermont on July 1, 2001), the writers instruct that the new article "eliminates this usage." In order to be enforceable, a security agreement must contain the elements set forth in the definition of a "security interest." Under 9A V.S.A. § 1-201(37), a "security interest" is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." Neither § 1-201(37) nor § 9-203(b)(3)(A) specifically requires a writing, but § 9-203(b)(3)(A) does require that the security agreement be authenticated. "Authenticated" means to sign or affix a symbol "with the present intent of the authenticating person to identify the person and adopt or

---

[1] The Court finds that 9A V.S.A. §§ 9-203(b)(3)(B),©), and (D) do not apply as the alleged collateral is neither certificated security, deposit accounts, electronic chattel paper, investment property, letters of credit or in the possession of Attorney McKnight, the creditor in this matter.

accept a record." 9A V.S.A. § 9-102(7)(A)(B). This implies that some sort of writing with a signature or symbol is required in order to enforce a security interest. In order to satisfy this requirement, Attorney McKnight offered into evidence a ratified retainer letter signed by the Debtor on October 26, 2003 (the "ratified retainer"). The Debtor signed the ratified retainer on June 24, 2003. It contained the language in the original retainer letter, which was not signed by the Debtor, but also had additional language specifically holding the Debtor liable for costs and fees incurred since the first retainer letter was signed on June 24, 2003 (doc. #46 Ex. C ). The ratified retainer does not satisfy the writing requirement for creation of a security interest in the snowmobile because it does not contain a description of the alleged collateral, or articulate the creation of -- or the intent to create – a security interest. Moreover, the ratified retainer does not make reference to any collateral whatsoever. Although the ratified retainer may be sufficient to create an obligation by the Debtor to pay attorney's fees from June 24th forward, it does not, in and of itself, establish a security interest.

Description of the Collateral

Under 9A V.S.A. § 9-203(b), in order to establish an enforceable security interest, the authenticated security agreement must include a description of the collateral. To satisfy this requirement, Attorney McKnight relies solely upon the notes of her paralegal, Ms. Lockwood, that were taken in connection with a telephone conversation between Ms. Lockwood and the Debtor on December 16, 2003 from 3:58 P.M. to 4:05 P.M. (doc. #46 Ex. G; Lockwood Aff. ¶ 11) (the "notes"). The notes, taken on a "While You Were Out" pad, include a description of the snowmobile by year and make. However, the notes do not include the signature of the Debtor and in fact, there is nothing in the notes that ties the description of the snowmobile to an offer of collateral to secure payment of the attorney's fees. Attorney McKnight argues that the notes constitute a separate writing which, taken together with the ratified retainer, constitute an authenticated security agreement that binds the Debtor. The Court has been presented no case law or statutory authority upon which it can rely to determine that notes from a telephone conversation taken down by a third party could be construed as a writing authenticated by the Debtor. Under 9A V.S.A. § 1-201, a writing "includes printing, typewriting or any other intentional reduction to tangible form." While the notes from the telephone conversation may be construed as an "intentional reduction to tangible form," they were not placed into a tangible form by the Debtor or by Attorney McKnight, nor is it certain that they are a tangible form of the Debtor's thoughts. Since the author of the notes was a third party, Attorney McKnight's paralegal, at best, the notes would represent Ms. Lockwood's interpretation of the Debtor's thoughts. The notes do not establish that there was a meeting of the minds between Attorney McKnight and the Debtor with respect to the Debtor pledging any collateral to secure his payment of her legal fees, or constitute a description of the collateral for purposes of enforcing a security interest.

Attorney McKnight relies upon legal authority from the Eighth Circuit, In re Cantu, 238 B.R. 796 (B.A.P. 8th Cir. 1999), to argue that the ratified retainer and the notes, taken together, do satisfy the writing requirement for a valid security agreement. However, Cantu is distinguishable from the instant case in significant ways. In Cantu, the documents offered were a loan agreement that had the debtor's signature and a funds advance voucher which contained a description of the collateral. Additionally, the two documents were part of an open-end loan program which was designed to require the debtor to sign one loan agreement. Id. at 799. By contrast, the documents in the instant case do not depend upon one another for the transaction to be complete and were not intended from the outset of the transaction to act in tandem. The ratified retainer and the notes are connected only insofar as both involve Attorney McKnight's representation of the Debtor and his arrangements to pay the fees due. Unlike the documents described in Cantu, the ratified retainer and the notes here do not make reference to each other and there is no evidence to indicate that Attorney McKnight intended to seek collateral to secure the payment required under the ratified retainer agreement either at the time the original retainer agreement was executed or when the ratified retainer was signed by the Debtor. Attorney McKnight has not presented, and the Court has not found, any case law to support the proposition that two such independent documents can be aggregated into a security agreement – particularly where the debtor disputes ever having agreed to secure the debt. On the contrary, the few cases which have considered this question have found a security agreement only where the documents are intricately and necessarily connected. See, Agricredit Acceptance Co. v. F. Singleton, 33-661 (La.App. 2 Cir. 8/23/00) 767 So.2d 137 (supporting the finding of a flexible definition of security agreement which includes documents which are incorporated into one another or clarify one another); see also, In re Tracy's Flowers and Gifts, Inc., 264 B.R. 1 (Bankr. W.D. Ark. 2001) (supporting the finding that creditor's loan documents considered together, created an enforceable security interest). Moreover, it appears from the record that the request for collateral was an afterthought, that Attorney McKnight did not perceive or act upon the need for collateral until months after the ratified retainer was executed.

### Meeting of the Minds

In the absence of a clear security agreement, Attorney McKnight must demonstrate that there was a meeting of the minds as a pre-requisite to the creation of a security interest, see, e.g., 9A V.S.A. §§ 9-203(b)(3)(A) and 1-201(3). When determining whether a meeting of the minds exists, the operative time is that moment when the alleged agreement was made. Vaughan v. Tetzlaff, 141 Vt. 150, 154, 446 A.2d 356, 358 (Vt. 1982). The aggregating of documents was allowed in Cantu because there was "no question about the understanding of the parties." In re Cantu at 800. In Cantu, it was clear that the parties intended from the outset to create a security agreement and had a meeting of the minds both about whether to create a security agreement and about what the collateral was. Attorney McKnight argues that Cantu is persuasive authority

to join separate documents, namely the ratified retainer and the telephone message notes, to create one authenticated security agreement. While the Court leaves open the question of whether some circumstances may compel a finding that separate documents may be aggregated to create a security agreement in Vermont, there is no evidence that demonstrates the requisite meeting of the minds for such a finding between Attorney McKnight and the Debtor. During the Debtor's testimony, he was asked six times on direct and cross examination about whether he intended to give the snowmobile to Attorney McKnight as collateral and he answered in the negative each time:

> [Attorney Walls - Direct Examination]
> Q. Okay. You - - let's talk about the snowmobile. You offered to bring that - - actually you offered to sell that, is that what you said?
> A. I told her I do have a snowmobile that I own. I could sell it. I could bring that down to sell ®. at 27, lines 6-10).
>
> [Attorney Walls - Direct Examination]
> Q. Did you offer a security interest in the snowmobile?
> A. Not to my knowledge.
> Q. Do you know what that means?
> A. Not really, but I didn't - - I told her I would sell it . . .
> Q. But you didn't offer to give her the right to take it?
> A. No. . . .I had a snowmobile that was paid off that I could bring down and sell because she had no interest in the snowmobile itself . . . ®. at 27-28, lines 15 - 4).
>
> [Attorney Walls - Direct Examination]
> Q. Did you offer to give her the snowmobile?
> A. No ®. at 28, lines 18-19).
>
> [Attorney Walls - Direct Examination]
> Q. . . .Did you ever sign any agreement to pledge any property at all?
> A. None ®. at 30, lines 21-23).
>
> [Attorney Walls - Re-Direct Examination]
> Q. I just want to make it really really clear did you offer to give Ms. McKnight the snowmobile?
> A. No. I offered to - - no.
> Q. Did you offer - - did you suggest that she sell it?
> A. I said I would bring it down and park it in her dooryard, Shelburne Road, or my car.
> Q. So you didn't specifically say you take this and sell it, right?
> A. No ®. at 59, lines 7-16).

> [Attorney McKnight - Re-Cross Examination]
> Q. Just to clarify that last bit of questioning, you did tell me or my office that you would bring it down, put it in my parking lot, put a for sale on it, and permit me to sell it, correct?
> A. I don't know if I said permit you to sell it. I said I would bring it down and sell it, yes ®. at 59-60, lines 21-1).

In each response, the Debtor stated his offer to bring the snowmobile to Attorney McKnight's office and sell it from the office's parking lot. The closest Attorney McKnight comes to having the Debtor say he gave her the snowmobile as collateral is during cross-examination.

> Q. Okay. Isn't it true that you offered to bring the snowmobile to my parking lot at 207 Webster Road which is right off Route 7?
> A. Yes.
> Q. And leaving it there with a for sale sign on it?
> A. Yes.
> Q. And you said that I could sell it and apply the proceeds to your bill, right?
> A. Yeah ®. at 46-47, lines 18-2).

But this was refuted on re-direct examination by Attorney Walls and re-cross examination by Attorney McKnight.

> [Attorney Walls - Re-Direct Examination]
> Q. I just want to make it really really clear did you offer to give Ms. McKnight the snowmobile?
> A. No. I offered to - - no.
> Q. Did you offer - - did you suggest that she sell it?
> A. I said I would bring it down and park it in her dooryard, Shelburne Road, or my car.
> Q. So you didn't specifically say you take this and sell it, right?
> A. No ®. at 59, lines 7-16).
>
> [Attorney McKnight - Re-Cross Examination]
> Q. Just to clarify that last bit of questioning, you did tell me or my office that you would bring it down, put it in my parking lot, put a for sale on it, and permit me to sell it, correct?
> A. I don't know if I said permit you to sell it. I said I would bring it down and sell it, yes ®. at 59-60, lines 21-1).

Attorney McKnight did not present sufficient evidence contradicting this assertion. Attorney McKnight offered the affidavit of Ms. Lockwood as evidence that during the December 16, 2003 conversation the Debtor in fact offered a security interest in the snowmobile to Attorney McKnight. The Court does not find that the affidavit establishes this fact. In Lockwood's recounting of the conversation, she said:

> He offered to bring his snowmobile to our parking lot. Said he does not owe a penny on it; that he bought it for $5,300.00. Debtor said to put a sale sign on it, and it would sell in a heartbeat for $3,500.00 and McKnight could keep the money (Lockwood Aff. ¶ 11).

The affidavit does not establish that the Debtor intended to give the snowmobile to Attorney McKnight as collateral for his obligation to pay the attorney's fees. In fact, the affidavit supports the Debtor's testimony that he wanted to sell the snowmobile from her parking lot but that he did not intend to give Attorney McKnight control of the snowmobile.

Attorney McKnight also presented a letter, written to the Debtor following the phone conversation with Ms. Lockwood, to demonstrate a meeting of the minds. She asserted that her letter operated as an acceptance of his "offer" to sell the snowmobile (doc. #46 Ex. H). The Court is not persuaded. Had she intended at that time to view the Debtor's offer as an offer of a security interest, she could have sent a writing with a description of the collateral for him to authenticate, in order to create a valid security agreement under 9A V.S.A. § 9-203. As an attorney she would have known that such a document would be required to demonstrate creation of a security interest, and she probably had access to security agreement forms. Had she sent such a document to the Debtor, it would have demonstrated her understanding that the Debtor intended to offer collateral and her intent at that time to accept that offer and enter into a security agreement. However, she did not. Instead, she sent a letter expressing her appreciation for his offer to sell the Polaris and encouraging him to do so (doc. #46 Ex. H). The December 17th letter did not contain a demand for a security agreement nor any language to suggest that she viewed the Debtor's proposal regarding the Polaris snowmobile as an offer of collateral nor any language clearly accepting a security interest in the snowmobile. While the Court recognizes the fundamental unfairness of any 20-20 hindsight type analysis, where the creditor is an attorney and is arguing for a determination that a security interest exists notwithstanding the absence of virtually all of the formalities required to create a security interest, the Court must look at what opportunities the creditor had to establish those formalities and avoid the harsh result of a determination that no security interest exists.

### Value and Ownership of the Collateral

Two additional elements must be met in order to enforce a security interest against a debtor: value has been given and the debtor has rights in the collateral or the power to transfer the rights to a secured party. 9A V.S.A. § 9-203(b)(1)(2). No evidence was presented contradicting the Debtor's claim that he owned the snowmobile and had all rights in it, as potential collateral. It is also undisputed that Attorney McKnight provided legal services to the debtor. However, there is nothing in the record to demonstrate that she provided those legal services in exchange for a security interest in the collateral.

<u>Extraordinary Circumstances</u>

The Court recognizes that there were extraordinary factual circumstances coloring the relationship between the Debtor and Attorney McKnight, for which neither of them appears to be responsible. For example, it is quite likely that the cause for the delay between the date the ratified retainer agreement was executed and date the creditor began pressing for collateral may have been due, at least in part, to the apparently intentional misstatements by a friend of the Debtor who represented herself to be his wife and to have obtained the Debtor's signature on the original retainer agreement. The circumstances surrounding this person's retention of Attorney McKnight are despicable. The record is clear that Attorney McKnight provided legal services to the Debtor in good faith, based upon that forged retainer agreement, and no dispute has been raised as to the reasonableness of the attorney's fees Attorney McKnight seeks. However, those facts are not material to the instant matter. The only issue before the Court is whether Attorney McKnight's claim against the Debtor is secured and particularly whether there is an enforceable security interest between Attorney McKnight and the Debtor. This Court finds nothing regarding the apparent fraud in the inducement of this attorney - client (creditor - debtor) relationship, however, that authorizes it to find an enforceable security interest between the Debtor and Attorney McKnight. in the absence of both an authenticated security agreement and a meeting of the minds regarding whether the Debtor was granting Attorney McKnight a security interest in the snowmobile.

Even if the notes of the phone conversation are deemed sufficient to describe the collateral, and those notes and the ratified retainer are viewed together to satisfy the requirement of an authenticated security agreement with a description of the collateral, there is insufficient evidence to establish that both the Debtor and Attorney McKnight intended to enter into a security agreement at the time and that there was a meeting of the minds. <u>In re Lefevre</u>, 27 B.R. 40, 43, 35 UCC Rep.Serv. 614 (Bankr.Vt. 1983). If the Court found that a security interest had been created, the extraordinary circumstances of this case might well be sufficient to constitute a waiver of the normal perfection requirements, but we do not get to that issue since the Court finds, based upon the record presented, that no security interest was created.

## **Conclusion**

After reviewing the evidence presented, this Court finds that Attorney McKnight failed to establish that an enforceable security interest existed between herself and the Debtor. Therefore, her claim must be determined to be unsecured.

The Debtor's objection to the secured claim of Creditor Jane Osborne McKnight is sustained, and the unsecured claim of Ms. McKnight is allowed in the amount of **$6,544.08.**

This memorandum constitutes the Court's findings of fact and conclusions of law.

|  |  |
|---|---|
| Rutland, Vermont | Colleen A. Brown |
| September 22, 2004 | United States Bankruptcy Judge |